**UNITED STATES of America, Plaintiff,**

v.

**BRONX REPTILES, INC., Defendant.**

**No. 96 M 569 (CLP).**

United States District Court,
E.D. New York.

Dec. 17, 1996.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, NY, Stanley N. Alpert, Asst. U.S. Atty., for U.S.

Irving Heisler, Klein, Heisler & Klarrerck, P.C., New York City, for Defendant.

## OPINION AND ORDER

POLLAK, United States Magistrate Judge:

On May 9, 1995, the United States Fish and Wildlife Service (the "Service") issued a Violation Notice charging the defendant Bronx Reptiles, Inc. ("Bronx Reptiles") with the illegal importation into the United States of seventy-three (73) Solomon Island frogs under inhumane and unhealthful conditions, in contravention of 18 U.S.C. § 42(c). On April 17, 1996, the case was tried before this Court[1] and post-trial briefs were subsequently submitted by both parties. Based on the evidence presented at trial and upon consideration of the legal arguments presented, this Court makes the following findings of fact and conclusions of law.

*The Evidence At Trial*

### 1. Testimony of Inspector Yen

The government presented the testimony of three witnesses at trial. The first witness, Inspector Leo Yen, a fish and wildlife inspector with the Fish and Wildlife Service (the "Service"), testified that on or about May 9, 1995, he received instructions to proceed to the United Airlines cargo warehouse at John F. Kennedy International Airport ("JFK") in Queens, New York. As part of his responsibilities as a fish and wildlife inspector, Inspector Yen is charged with inspecting the importation or exportation of cargo containing live animals or wildlife products.

Inspector Yen testified that he first went to the import office, where he met with an individual previously known to him as Chris, an employee of defendant Bronx Reptiles. According to Inspector Yen's testimony, Chris handed him several documents, including: 1) a Form 3177 which is the Service's declaration form relating to the import or export of fish and wildlife; 2) a commercial invoice relating to a shipment of live skinks[2] and frogs; 3) an airway bill of Solomon Airlines; 4) a United States Custom Service Form 3461, which is a customs entry document; 5) a Solomon Islands government agricultural quarantine service document, declaring that the animals shipped were in good health; and (6) an export permit issued by the Solomon Islands Ministry of Natural Resources. According to the documents presented and examined by Inspector Yen, defendant Bronx Reptiles was listed as the importer or consignee of the shipment of skinks and frogs.

Following receipt of the documents from defendant's employee, Inspector Yen examined the shipment, which consisted of two wooden crates, each approximately two and a half to three feet wide and four to five feet long. In examining the contents of the boxes,[3] Inspector Yen determined that although the skinks appeared to be fine, the vast majority of the frogs were dead. Based on

---

1. Pursuant to 18 U.S.C. § 3401(b) (1996), this Court is authorized to try criminal petty (or misdemeanor) offenses upon consent of the parties, which was provided on April 17, 1996.

2. A skink is an animal that resembles a lizard.

3. Only one of the crates contained frogs and skinks; the other crate contained only skinks.

his examination, Inspector Yen gave a conditional release of the animals to Bronx Reptiles so that the live animals could be cared for, but he refused to clear the importation and issued a Refusal Clearance Report. In the Report, Inspector Yen noted that the frogs were packed in a shallow container, with no damp materials, no separate bags, and no water tray with sponge, which he considered to be inhumane and unhealthful conditions and not a "normal [way] to ship live frogs." [4] Inspector Yen further testified that the crates themselves were made of thin wood, not strong enough to hold a live animal shipment, and that the lid on the crate containing the frogs appeared to be slightly open and had been taped shut with airline tape on one end. He also testified that although there was a cloth of some sort in the box, he observed no signs of moisture, sponges or other damp materials. He did, however, notice that a cluster of frogs appeared crushed together in one end of the compartment.

Upon releasing the shipment to Bronx Reptiles, Inspector Yen instructed them to separate the live frogs from the dead ones and return the dead ones to Inspector Yen. The next day, Inspector Yen was informed by Bronx Reptiles that all of the frogs were dead.

### 2. *Testimony of Peter Brazaitis*

The government also presented the testimony of Peter Brazaitis, curator of animals at the Central Park Zoo and formerly the superintendent of reptiles and amphibians at the Bronx Zoo for over 20 years. He was qualified as an expert in the care, management, and transport of live reptiles and amphibians.

Specifically, Mr. Brazaitis testified that frogs, as amphibians, take in water and oxygen through their skin, which is part of their respiratory system, and that it is critical for frogs to have sufficient water to keep their skin from dehydrating. If the frog becomes dehydrated, its respiratory functions are impaired, causing stress to the animal and resulting in the rapid production of mucous, urine and toxins, which ultimately kills the animal. By contrast, skinks, which are reptiles, do not have to be kept moist. Mr. Brazaitis testified that while skinks need to drink water to survive, they may come from arid regions and therefore may tolerate dry conditions without any difficulty at all.

Thus, according to Mr. Brazaitis, it is critical that frogs and other amphibians be packed with a reservoir of water when transported so that their skin does not dehydrate. In addition, he testified that frogs should be packed in separate compartments and in groups of small numbers for two reasons. First, he explained that the compartments should be small enough to prevent the frogs from leaping about inside the compartment and injuring themselves by breaking their skin and causing abrasions on their snouts and elbows. Second, if one of the frogs becomes injured and dies, it decomposes rapidly and the resultant bacteria can spread to and kill the other frogs. Thus, if the frogs are kept separated into small compartments, the death or illness of one is less likely to be spread to the entire shipment.

Mr. Brazaitis then testified that in his experience as an importer of wild animals, it is customary for the importer to ensure the health and well-being of animals for which the importer has placed an order. Mr. Brazaitis testified that the shipping standards that he utilizes are the regulations of the International Airlines Transportation Association ("IATA"), which are guidelines for the airlines and for government agencies in the Wildlife Association. IATA catalogues all species of live animals and sets forth instructions for the size of the box, the environmental conditions and other requirements necessary to ensure the health of the animals during shipping. With respect to the shipper, Mr. Brazaitis testified that he would personally inspect the shipper, seek out references and then call the shipper to be certain that the shipper was aware of and understood the shipping requirements, including the IATA standards.

Mr. Brazaitis also testified that based on his review of the documents in this case and

---

4. Transcript of the April 17, 1996 trial (hereafter "Tr.") at 25–26.

the photographs taken of the frogs [5] in the condition in which they were shipped, it was his opinion that the method and conditions of shipment were not appropriate for the health and well-being of the frogs. The absence of any container of water or moist towels, coupled with the fact that the animals were all loosely packed together in an open area where they would bang themselves against the side of the box or even escape, led Mr. Brazaitis to his conclusion that they were improperly shipped. He then opined that had the frogs been separated into smaller groups in plastic containers with absorbent material containing water, it would have required another shipping box and would have added additional weight to the shipment—thus increasing shipping costs. Mr. Brazaitis further testified that given the larger number of skinks in the total shipment, the greater durability of the skinks, and the generally higher sales price of skinks in the United States as compared to the frogs, he felt that the importation of the skinks was the primary purpose of the shipment, with the frogs being "the frosting on the cake." (Tr. at 88–91).

On cross-examination, Mr. Brazaitis admitted that he had never purchased animals from the Solomon Islands nor did he necessarily visit the foreign countries from which he purchased wild animals. Rather, he relied on the supplier to package the animals properly and in accordance with his instructions. He also testified that on occasion, animals might die in shipment from old age or simply from the stress of being shipped. Mr. Brazaitis could not, however, recall any instance where an animal which he had ordered had died because of faulty packaging.

### 3. Testimony of Special Agent LiBrandi

Finally, the government called as a witness Special Agent Saverio LiBrandi of the U.S. Fish and Wildlife Service, Division of Law Enforcement, who testified that as part of his responsibilities, he was charged with investigating violations of various fish and wildlife statutes. He further testified that he had spoken on several occasions with Bruce Edelman from Bronx Reptiles and visited their facilities on a number of occasions during the course of conducting his investigations. He described the Bronx Reptiles facility in Yonkers as a large commercial establishment occupying a warehouse of several thousand square feet and employing approximately six to seven employees, including a secretary. He described Bronx Reptiles as one of the largest establishments of its kind on the east coast and among the five or six largest in the United States.[6]

During the course of his investigations, Agent LiBrandi visited Bronx Reptiles on or about April 1, 1993 and discussed with Mr. Edelman the responsibilities of an importer regarding the transportation of live animals into this country. The purpose for Agent LiBrandi's visit was to investigate two importations of live reptiles—iguanas and boa constrictors—from Colombia in March 1993. Both shipments, which were consigned to Bronx Reptiles, arrived in the United States with a substantial number of dead reptiles due to improper ventilation and improper labeling.[7] During the conversation, Mr. Edelman admitted that he was aware of the IATA guidelines used by the industry to determine how a specific species is to be shipped and of the container requirements listed in the guidelines. According to Agent LiBrandi, Mr. Edelman stated that he knew that, as an importer, he was liable for the conditions under which wildlife enters the United States. Based on the two shipments from Colombia, notices of violation were issued to Bronx Reptiles and the fines were subsequently paid.

---

5. Upon reviewing the shipping documents, Mr. Brazaitis noted that the invoice indicated that the species being imported was a species of frog indigenous to South America, and not the wild species of frog that was actually imported from the Solomon Islands in the Pacific.

6. Mr. Brazaitis had previously testified that Bronx Reptiles is a commercial entity that brings animals into this country and then sells them generally on a wholesale basis to other distributors or to a pet shop. In fact, Mr. Brazaitis had acquired two lizards for the Bronx Zoo that had originally come from Bronx Reptiles.

7. Out of a thousand iguanas, approximately 175 arrived dead, and somewhere between 10 and 100 out of 200 snakes arrived dead.

Agent LiBrandi testified that approximately a year later, in March 1994, Bronx Reptiles again was sent a formal letter and assessed a civil penalty for the importation of a shipment of small mammals and reptiles from Egypt, in which there were a number of dead animals discovered. Based on the investigation conducted, it was determined that the IATA guidelines had been violated and that the method of packaging the animals was determined to be improper. Specifically, there were a number of weaning mothers with young, which is prohibited by the regulations; there was inadequate space between the top of one crate and the bottom of another, restricting air circulation; and there was insufficient ventilation along the sides of the crates as prescribed by IATA regulations. Once again, Bronx Reptiles was assessed a penalty, which it paid.

Finally, in March 1995, Bronx Reptiles was cited for yet a fourth importation of animals in an inhumane fashion. This incident involved an importation of chameleons, skinks, geckos, other lizards and frogs. Not only was it determined that the IATA guidelines had been violated, but once again the shipment contained a number of dead animals, including frogs. According to Agent LiBrandi who investigated the case, the shipment was inadequately packed and had inadequate ventilation. Once again, a civil penalty was assessed against Bronx Reptiles as the importer.

On cross examination and then on redirect, Agent LiBrandi testified that Bronx Reptiles is responsible for approximately two shipments of live animals a week and these four incidents were not the only ones detected in violation of the shipping regulations.

The defendant presented no witnesses at trial.

### DISCUSSION

Defendant was charged with a violation of the Lacey Act, Title 18, United States Code, Section 42 (1995) (emphasis added), which provides in relevant part as follows:

§ 42. Importation or shipment of injurious mammals, birds, fish (including mollusks and crustacea), amphibia, and reptiles; permits, specimens for museums; regulations

\* \* \* \* \* \*

(b) whoever violates this section, or any regulation issued pursuant thereto, shall be fined under this title or imprisoned not more than six months, or both.[8]

(c) the Secretary of the Interior within one hundred and eighty days of the enactment of the Lacey Act Amendments of 1981 [enacted Nov. 16, 1981] shall prescribe such requirements and issue such permits as he may deem necessary for the transportation of wild animals and birds under humane and healthful conditions, *and* it shall be unlawful for any person, *including any importer,* knowingly *to cause or permit* any wild animal or bird to be transported to the United States, or any Territory or district thereof, under inhumane or unhealthful conditions *or* in violation of such requirements. In any criminal prosecution for violation of this subsection and in any administrative proceeding for the suspension of the issuance of further permits—

(1) the conditions of any vessel or conveyance, or the enclosure in which wild animals or birds are confined therein, upon its arrival in the United States, or any Territory or district thereof, shall constitute relevant evidence in determining whether the provisions of this subsection have been violated; and

(2) the presence in such vessel or conveyance at such time of a substantial ratio of dead, crippled, diseased, or starving wild animals or birds shall be deemed prima facie evidence of the violation of the provision of this subsection.

Under the terms of the statute, the government must prove that the defendant importer Bronx Reptiles (1) knowingly caused or permitted the transportation to the United

---

**8.** In this case, the violation as charged is brought solely against Bronx Reptiles, a corporation and not against any individuals. Thus, the government is not seeking imprisonment. Instead, the government seeks a $10,000 fine, pursuant to the Fine Enhancement Act of 1984, which raised the misdemeanor fine to $10,000 for an organization. 18 U.S.C. § 3571(c)(6).

States (2) of any wild animal or bird (3) under inhumane or unhealthful conditions or (4) in violation of any requirements prescribed by the Secretary of the Interior.

### 1. *Inhumane and Unhealthful Conditions*

■ Turning first to the question of whether the Solomon Island frogs were shipped and transported to the United States under inhumane or unhealthful conditions, I find that the government has clearly met its burden of proof on this element beyond a reasonable doubt. There appears to be no dispute that Bronx Reptiles caused the transportation and importation of the Solomon Island frogs. The documentary evidence, including the invoices, airway bills and customs documents, all establish that Bronx Reptiles was the importer or consignee of the shipment. Moreover, there appears to be no dispute that an employee of Bronx Reptiles appeared at the airport to receive the shipment.

The government has also established beyond a reasonable doubt that the frogs were shipped under inhumane conditions. Both government witnesses, Inspector Yen and Mr. Brazaitis, testified that in their experience the frogs here were packed in a manner that was not appropriate for the shipment of frogs. Not only were they shipped loose in large wooden crates and not in separate bags, but they were packed without any damp materials or water trays. Both the requirements that there be adequate sources of water and small containers are prescribed by the industry standards published by IATA, of which defendant's president, Mr.

Edelman admitted he was fully aware. Apart from noncompliance with the industry standards, Mr. Brazaitis testified extensively regarding the effects of dehydration on the respiratory functions of frogs and the need for frogs to have sufficient water to keep their skin from dehydrating. That alone establishes to this Court's satisfaction that the method of shipment here was inhumane.[9] Depriving a frog of sufficient moisture is virtually a guaranteed death sentence for that frog, and in this case, the fact that every single frog in the shipment died certainly supports that conclusion.[10] Moreover, an examination of the photographs of the dead frogs taken after their arrival, coupled with Mr. Brazaitis' testimony regarding the injuries that can be incurred when frogs are not packed in separate containers, simply reinforces this Court's finding that these were inhumane and unhealthful conditions. Given the absence of any evidence or testimony to the contrary, this Court finds that this element of the offense has been established.

### 2. *Frogs Are "Animals" For Purposes Of The Statute*

Defendant contends that in enacting the Lacey Act, Congress never intended frogs or reptiles to be covered by the statute. Specifically, it points to a regulation intended to implement section 9(d) of the Lacey Act, and issued by the Secretary of the Interior, 50 C.F.R. 14.101. This regulation prescribes the standards and requirements for ensuring the shipment of "wild mammals and birds."

---

**9.** Defendant argues that the government failed to prove that the frogs died because of the manner in which they were packed. Defendant suggests that the frogs may have died as a result of damage to the crate while in the custody of the airlines. This argument is without merit. The statute does not require proof of how the animals died; it simply requires a showing that they were shipped under inhumane conditions. Regardless of whether the containers were damaged in shipment, the evidence showed that the method of packing the frogs loose and without water was inappropriate and that had proper procedures been followed, the effect on the frogs of any damage incurred to the container during shipment would have been minimized.

**10.** In this case, unlike *United States v. States Marine Lines, Inc.*, 334 F.Supp. 84 (S.D.N.Y.

1971), there is no need for the government or this Court to rely on the inference authorized under the statute that "the presence ... of a substantial ratio of dead, crippled, diseased, or starving wild animals ... shall be deemed prima facie evidence of the violation." 18 U.S.C. § 42(c)(2). Even though the ratio here was the 100% loss of frogs, this Court finds that there was sufficient additional evidence adduced at trial of the inhumane shipping conditions to warrant a finding of inhumane conditions without the need to resort to the inference. *C.f., United States v. States Marine Lines, Inc.*, 334 F.Supp. at 88–89 (finding on the evidence that the shipping conditions were adequate and holding that where only 15% of the animals had died, the conditions for drawing the inference, of questionable constitutionality, had not been satisfied).

Defendants argue that since "[f]rogs are reptiles," they are not covered by the regulation.

First, defendants are simply wrong when they classify frogs as reptiles. Frogs are indisputably amphibians and Mr. Brazaitis testified extensively regarding the differences between reptiles and frogs or other amphibians.

Moreover, in arguing that frogs were not intended to be covered by the statute, defendant ignores the plain language of the statute itself. The definition section of the Lacey Act, 16 U.S.C. § 3371(a), specifically includes amphibians as a covered species:

> The term "fish or wildlife" means any wild animal, ... including without limitation any wild mammal, bird, reptile, *amphibian*, fish, mollusk, crustacean, arthropod, coelenterate, or other invertebrate....

16 U.S.C. § 3371(a) (1996) (emphasis added). Similarly, 18 U.S.C. § 42 is entitled "Importation or shipment of injurious mammals, birds, fish (including mollusks and crustacea), amphibia, and reptiles...."

Although not expressly set forth in defendant's papers, it appears that what defendant is arguing is that since under the statute, the Secretary of the Interior has the power to prescribe certain requirements for the transportation of wildlife and did prescribe 50 C.F.R. 14.101, which was limited to wild mammals and birds, that the other types of wildlife specified in the statute itself are no longer covered. However, as the government points out, that portion of the statute directing the Secretary of the Interior to prescribe requirements as he "may deem necessary" is drafted in the disjunctive. The statute provides, without reference to any

regulations or requirements instituted by the Secretary of the Interior, that the transportation of animals under inhumane conditions shall be unlawful. The statute further provides, in the alternative, that the transportation of animals in violation of the Secretary's requirements shall be unlawful.

> [I]t shall be unlawful for any person, including any importer, knowingly to cause or permit any wild animal or bird to be transported to the United States, under inhumane or unhealthful conditions or in violation of such requirements [as prescribed by the Secretary of the Interior].

18 U.S.C. § 42(c) (1996).

Here, using the well-established principles of statutory construction, this Court holds that the language of the statute is clear and the plain language governs. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Frogs and other amphibia are, as Congress intended, covered by this statute. Thus, based on the evidence presented at trial, the government has established beyond a reasonable doubt the second element in the offense—namely, the transportation of wild animals into the United States.

### 3. *Knowledge of the Importer*

Defendant argues that it is entitled to a judgment of acquittal in this case because the government has failed to prove beyond a reasonable doubt that Bronx Reptiles knew that the frogs were improperly packed or caused them to be improperly packed. Citing *United States v. Main Street Distributing Inc.,* 700 F.Supp. 655 (E.D.N.Y.1988),[11]

11. In *United States v. Main Street Distributing Inc.,* the defendants, charged with having knowingly and wilfully offered articles of drug paraphernalia for sale in interstate commerce, challenged the constitutionality of 21 U.S.C. § 857, arguing, *inter alia,* that the absence of a scienter requirement in the statute violated due process. 700 F.Supp. at 655, 663. Noting that "[d]ue process permits a narrow exception, imposing strict criminal liability absent any proof of a defendant's scienter, with respect to certain regulatory measures ... particularly where penalties are relatively small and conviction does no great damage to reputation," the court stated that " '[a]bsent indication of contrary purpose in

the language or legislative history of [a] statute,' scienter is presumed to be an element of any federal crime." *Id.* (citations omitted) (quoting *Liparota v. United States,* 471 U.S. 419, 425, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985)). The court went on to find that the language of § 857 "strongly suggeste[d] that Congress intended 'to require some mental state with respect to some element of the crime.' " *Id.* (quoting *Liparota,* 471 U.S. at 424, 105 S.Ct. at 2087–88).

In the case at bar, the government does not contend that this section of the Lacey Act was intended to be a strict liability offense, but rather than it was intended to be a general intent, not a specific intent crime. The government's posi-

defendant argues that scienter is presumed to be an element of this federal criminal statute and thus, in the absence of any proof of any knowledge on the part of Bronx Reptiles that the frogs would be shipped under inhumane conditions, it cannot be found guilty of violating this statute.

Under the statute, it is unlawful for any person "including an importer ... knowingly to cause or permit any wild animal ... to be transported ... under inhumane or unhealthful conditions." 18 U.S.C. § 42(c). As provided in this section, "knowingly" is clearly an element of the offense. The issue is whether it is sufficient for the government to prove that the defendant acted knowingly in causing or permitting the transportation of the animal or whether the government must also show that the defendant had knowledge of the inhumane or unhealthful shipping conditions. Since there does not appear to be any case directly addressing this issue under this statutory provision, this Court looks first to the language of the statute itself and then to its legislative history.

### a) *The Statutory Language of 18 U.S.C. § 42(c)*

The structure of the statute itself makes it plain that Congress intended this to be a general intent rather than specific intent crime. Had Congress intended to require proof that the importer have knowledge of the inhumane and unhealthful shipping conditions, it would have drafted the language in such a way to ensure that the knowledge element modified the conditions of shipment and not just the act of causing or permitting the transport of the animals. *See United States v. Tolkow*, 532 F.2d 853, 858 (2d Cir. 1976) (holding that the language "[w]hoever ... knowingly ... fails to disclose any fact the disclosure of which is required by [a certain law]" meant that Congress intended

to require a knowing failure to disclose but not knowledge of the particular reporting requirement of the law). *See also United States v. St. Onge*, 676 F.Supp. 1044, 1045 (D.Mont.1988) (holding that under the Endangered Species Act, the use of "knowingly" was meant to require knowledge of the volitional act of shooting an animal, but not to require knowledge that the specific animal shot was endangered); *United States v. Billie*, 667 F.Supp. 1485, 1492 (S.D.Fla.1987) (same). As drafted, the statute at bar requires that there must be a showing that the defendant acted " 'voluntarily and intentionally and not because of mistake or accident' " in causing or permitting the transport of these animals. *Id.* (quoting from Pattern Jury Instructions for criminal cases in the Eleventh Circuit.).

This construction of the knowledge requirement of the statute as a general intent requirement comports with and would best give effect to the regulatory and protective purposes of the statute as reflected in the legislative history. The legislative history makes it clear that Congress intended this provision of the Lacey Act [12] to be a regulatory provision, enacted to deal with the inhumane treatment experienced by live wildlife transported to the United States aboard ship without proper care or facilities. *See* P.L. 80–818 Foreign Wild Animals and Birds— Importation Prohibited, Senate Report No. 80–1447, June 21, 1948; House Report No. 80–2333, June 12, 1948, reprinted in 1948 U.S.C.C.A.N. 2180–2182. The colloquy between the legislators and proponents of the provision focused on the problems associated with holding foreign shippers liable for the conditions in which animals were shipped and the need to hold the U.S. importer responsible for ensuring, by contract or otherwise, that the transportation would be done in a humane fashion.[13] The fact that the statuto-

---

tion, as set forth below, comports with both the legislative history of the section and the explicit language of the statute, which contains a scienter requirement as to the element of causing or permitting the transport of wild animals. Thus, *Main Street Distributing* does not persuade this Court to adopt defendant's position and construe the statute as requiring the importer to know that a shipment of animals was transported under inhumane or unhealthful conditions.

**12.** Although the Lacey Act was originally enacted in 1900, the provision against inhumane transport, which is the subject of this prosecution, 18 U.S.C. § 42(c), was added after a series of hearings held in 1948.

**13.** The following discussion between presiding Senator Moore and Mr. Archibald McDonald, then Chief Inspector of the Animal Rescue League of Boston, Massachusetts is instructive:

ry language singles out the "importer" for specific reference as a person to be held responsible under the Act is further evidence of Congressional intent to place liability directly on the importer.

Thus, in light of both the reasonable construction of the language of the statute and the clear intent of Congress to enact a regulatory statute designed to protect wild animals shipped to this country, this Court finds defendant's proposed construction of the statute to be contrary to the clear intent of Congress and would negate the Act's purpose. As the court in *United States v. Billie* recognized when construing the Endangered Species Act:

> "The construction advanced by the defendant would eviscerate the Act's purpose because it would be nearly impossible to prove that the average hunter recognized the particular subspecies protected under the Act. Accordingly, the Government need prove only that the defendant acted with general intent when he shot the animal in question."

667 F.Supp. at 1493.

Here, it would be virtually impossible for the government to prove that an importer knowingly caused the shipment of an animal with knowledge that the overseas shipper was sending the animal under inhumane conditions.

The case at bar is illustrative of the difficulties faced in proving such a knowledge requirement. Here, the government had specific proof that Bronx Reptiles, one of the largest importers of its kind in the country and responsible for numerous shipments of amphibians and reptiles, was not only aware of the industry guidelines for shipping these types of animals, but was also very familiar with the regulation holding the importer responsible for ensuring that humane shipping conditions are used. Knowledge of the statute and its potential penalties had not only been imparted to defendant through conversations with a Special Agent of the Service, but through three prior violations in which Bronx Reptiles had been cited for shipping irregularities where a substantial portion of animals had arrived dead. Nevertheless, in the absence of testimony from the Solomon Islands shipper, who is beyond the jurisdiction of this Court, or admissions of the defendant, the government has no way of proving what instructions or steps were taken by defendant to ensure that the frogs here would be shipped in accordance with the recognized humane standards.[14]

Senator Moore.... This is a matter for legislation, making it a penal offense against whom? Who would this penalty be against where you have inhumane treatment of animals shipped from overseas to this country? Mr. McDonald. I do not believe we could hold somebody in Africa for it.

* * * * * *

Senator Moore. Whom are you going to hold liable here?
Mr. McDonald. The only way we could hold them I believe, is the man who purchases them here. If you hold him up, then you will get results.
Senator Moore. That is the importer?
Mr. McDonald. That is right.

* * * * * *

Senator Moore.... The question is: whose duty is it to see [the animals] are humanely loaded and handled and shipped? Do you want to impose that on the vessel?

* * * * * *

Senator Moore. Should that be made the duty of the importer?
Mr. McDonald. The importer seems to be the only man that we could—

Senator Moore. That is the only man that I think should have that responsibility.
Requiring Humane Treatment of Animals and Birds, Hearing Before A Subcommittee of the Committee on Interstate and Foreign Commerce, United States Senate, 80th Congress, 2d Session, on S.1447 (May 7, 1948), at 7–10.

14. The government argues that the defendant should be found guilty even if knowledge of the inhumane conditions is required. The government contends that there is sufficient proof to find that the defendant consciously avoided knowledge of the conditions under which the frogs would be shipped and that a guilty verdict would be warranted under *United States v. Lanza*, 790 F.2d 1015, 1021–24 (2d Cir.), *cert. denied*, *Lyubarsky v. United States*, 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). This Court disagrees. Unlike the defendant in *Lanza*, who had unquestionably participated in an unlawful conspiracy but claimed lack of knowledge of its unlawful aims and objectives, *id.* at 1022, the importer in this case has not been proven to have any knowledge of what the shipper did or failed to do prior to the arrival of the shipment in this country. The government has not presented evidence to show whether the defendant had ever ordered from this shipper before, whether defen-

Construing this statutory provision to require a showing of general intent comports with the general rule that regulatory statutes designed to promote and protect the public welfare "should be construed to effectuate their regulatory purpose." *United States v. Billie,* 667 F.Supp. at 1492. *See also Johnson & Towers, Inc.,* 741 F.2d 662, 666 (3d Cir.1984), *cert. denied, Angel v. United States,* 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 321 (1985); *United States v. St. Onge,* 676 F.Supp. at 1045. In holding a corporate executive of a drug company subject to prosecution for violating the Food, Drug, and Cosmetic Act for shipping adulterated products even though the statute did not require that the executive know of the adulteration, the Supreme Court in *United States v. Dotterweich,* explained the purpose behind such legislation:

> Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger.

320 U.S. 277, 280–81, 64 S.Ct. 134, 136–37, 88 L.Ed. 48 (1943) (citations omitted). *Accord United States v. Park,* 421 U.S. 658, 672, 95 S.Ct. 1903, 1911–12, 44 L.Ed.2d 489 (1975) (holding that the Food, Drug and Cosmetic Act imposed "a duty to implement measures that will insure that violations will not occur").

Circuit courts throughout the country, with the exception of the Fifth Circuit, have held that misdemeanor crimes under the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 *et seq,* are strict liability crimes that do not require any evidence of scienter in order to establish a violation. *See, e.g., United States v. FMC Corp.,* 572 F.2d 902, 906 (2d Cir.1978). *See also United States v. Boynton,* 63 F.3d 337, 343 (4th Cir.1995) (and cases cited therein). *But see United States v. Garrett,* 984 F.2d 1402, 1410, n. 17 (5th Cir.1993) (noting that the Fifth Circuit's re-

quired proof of scienter was "[u]nique among the Circuits ... and contrary to the intent of a subsequent Congress") (citations omitted). Similarly, courts interpreting the language of the Endangered Species Act, as noted above, have uniformly held it to be a general intent statute. *See, e.g., United States v. St. Onge,* 676 F.Supp. at 1045; *United States v. Billie,* 667 F.Supp. at 1492.

 Moreover, given the penalties that can be imposed upon defendant importers, this Court finds that there is no violation of due process. As the Supreme Court noted in *Morissette v. United States,* 342 U.S. 246, 256, 72 S.Ct. 240, 246, 96 L.Ed. 288 (1952), proof of specific intent is not required where the "penalties ... are relatively small, and conviction does no grave danger to an offender's reputation." *See also United States v. Engler,* 806 F.2d 425, 432–34 (3d Cir.1986), *cert. denied,* 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987) (holding that there was no due process violation when a defendant was convicted of a felony under the MBTA even in the absence of a showing of scienter, reasoning that the felony consequences of the MBTA were not qualitatively different from those provided for misdemeanor convictions).

 In light of the statutory language and legislative intent behind the enactment of this provision of the Lacey Act, coupled with the absence of any due process concerns, this Court holds that 18 U.S.C. § 42(c) was intended to be a general intent crime only and that the government need only prove that defendant acted knowingly when it caused or permitted the transportation of the frogs to the United States. Based on the evidence presented at trial, including the testimony of Inspector Yen regarding his conversations with the personnel from Bronx Reptiles, and the shipping and importation documents admitted as evidence during the trial, showing Bronx Reptiles to be the importer and consignee of the shipment, this Court finds that the government has estab-

dant had ever visited the shipper and inspected its premises, sought or interviewed the shipper's references, or discussed with the shipper its compliance with the IATA regulations. Without proof that the defendant "clos[ed] his eyes to

what is readily apparent," *id.* (citing *United States v. Reed,* 790 F.2d 208 (2d Cir.1986)), this Court cannot find that defendant consciously avoided knowledge of the conditions under which the frogs were ultimately shipped.

lished its burden with respect to the knowledge element beyond a reasonable doubt.

*Conclusion*

For the reasons stated above, this Court finds the defendant Bronx Reptiles, Inc. guilty of the violation of 18 U.S.C. § 42 as charged. The parties are directed to contact this Court to schedule a date for sentencing.

**SO ORDERED.**