UNITED STATES of America,
Appellee,

v.

**BRONX REPTILES, INC.,**
Defendant–Appellant.

Docket No. 98–1686

United States Court of Appeals,
Second Circuit.

Argued May 7, 1999

Decided June 30, 2000

Irving Heisler, New York, NY, for Defendant-Appellant.

Stanley N. Alpert, Assistant United States Attorney, Eastern District of New York (Zachary W. Carter, United States Attorney, Eastern District of New York, and Emily Berger, Assistant United States Attorney, Eastern District of New York, of counsel), for Appellee.

Before: OAKES, CABRANES, and SACK, Circuit Judges.

Judge OAKES dissents in a separate opinion.

SACK, Circuit Judge:

We return in this appeal to a vexatious problem. When a criminal statute renders unlawful an act "knowingly" undertaken by the defendant, what must the extent of the defendant's knowledge be to permit conviction?

■ The defendant, Bronx Reptiles, Inc., was convicted following a bench trial in the United States District Court for the Eastern District of New York (Cheryl L. Pollak, *Magistrate Judge*) of violating that portion of the Lacey Act, codified as amended at 18 U.S.C. § 42(c), that makes it a misdemeanor "for any person, including any importer, knowingly to cause or permit any wild animal or bird to be transported to the United States, or any Territory or district thereof, under inhumane or unhealthful conditions or in violation of such requirements" as the Secretary of the Interior may prescribe. *See United States v. Bronx Reptiles, Inc.*, 949 F.Supp. 1004 (E.D.N.Y.1996). The district court (Sterling Johnson, Jr., *Judge*) affirmed. *See United States v. Bronx Reptiles, Inc.*, 26 F.Supp.2d 481 (E.D.N.Y.1998). The defendant argues on appeal that under § 42(c), the government was required to prove not only that the defendant knowingly caused the transportation to the United States of a wild animal or bird, but also that the defendant knew the conditions under which the animal or bird was transported were "inhumane or unhealthful." We agree. Because the magistrate judge concluded that there was no evidence to support such a finding, *see Bronx Reptiles*, 949 F.Supp. at 1012 n. 14, we reverse.

## BACKGROUND

On May 9, 1995, Leo Yen, an inspector for the United States Fish and Wildlife

Service, went to the United Airlines cargo facility at John F. Kennedy International Airport to inspect a shipment that had just arrived from the Solomon Islands. It was bound for the defendant, Bronx Reptiles, Inc., a large commercial importer and wholesale distributor of animals. Yen met one of the defendant's employees who handed Yen the import-entry paperwork for the shipment.

The shipment consisted of two identical wooden boxes, each approximately two and one-half to three feet wide and four to five feet long. One of the boxes had airline tape around it but its lid was nonetheless ajar. Opening that box, Yen found that about three-quarters of the box contained skinks,[1] all of which appeared to be in good condition. But crushed together in a compartment at the end of the box were several dozen frogs. At first the frogs appeared to be dead, but on closer examination, Yen saw that a few of them were still moving. The second box contained only skinks, all of which appeared undamaged.

Yen released the shipment to the defendant so that it could tend to the skinks and the surviving frogs, but he refused to sign off on the importation. On a Report of Refused Clearance, Yen wrote: "no damp materials, [a] shallow container, no separate bags, no water tray w/sponge." Yen instructed the defendant through its employee to separate the dead frogs from the live frogs and to return the dead ones to Yen. The next day he received a package from the defendant containing all the frogs that had been shipped; all had died.

On May 9, 1995, the Fish and Wildlife Service issued a Violation Notice to the defendant charging it with violation of 18 U.S.C. § 42(c). On April 17, 1996, the case was tried, on consent of the parties pursuant to 18 U.S.C. § 3401(b), before Magistrate Judge Pollak in the Eastern District of New York. The government called three witnesses: Yen, Peter Brazaitis, and Saverio LiBrandi.

Brazaitis, a curator of animals at the Central Park Zoo and a herpetologist, was qualified as an expert in the care, management, and transport of live reptiles and amphibians. He testified that if a frog becomes dehydrated, its respiratory functions are impaired, causing stress to the animal and resulting in the rapid production of mucous, urine, and toxins, which ultimately kills the animal. In order to protect frogs against dehydration, they should be shipped with a reservoir of water available to them. They also should be packed in relatively small compartments in order to prevent them from leaping about and injuring themselves. And a relatively small number of frogs should be placed in each compartment to protect against the spread of noxious bacteria from a single frog to the entire population. Brazaitis opined that based on his examination of the shipment in this case, the method and conditions of shipment were improper, both because there was no water vessel or moist towel in the crate and because the frogs were not packed in small groups in separate containers.

Brazaitis further testified that in his experience as an importer of wild animals, it was customary for the importer to ensure the health and well-being of the animals for which the importer has placed an order. He testified that there are standards promulgated by the International Air Transport Association ("IATA") that specify the size of the box, environmental conditions, and other requirements necessary to ensure the health of animals being shipped. When he was responsible for such importation, he said, he personally reviewed the qualifications of the shipper, sought out references, and called the shipper to make sure it was aware of shipping requirements, including IATA standards. He admitted during cross-examination, however, that he did not necessarily visit the foreign countries from which he pur-

1. A skink is "any of a family ... of typically small insectivorous lizards with long tapering bodies." Merriam–Webster's Collegiate Dictionary 1100 (10th ed.1998).

chased animals, and that he relied on the shipper to package the animals properly. Brazaitis also testified that had the frogs been shipped to the defendant properly packaged, the costs of shipping would have been higher.

LiBrandi, a special agent for the Division of Law Enforcement of the Fish and Wildlife Service, testified that the defendant was responsible for about two shipments of live animals into the United States a week. He testified that the Fish and Wildlife Service had assessed civil penalties against the defendant on at least three previous occasions. The first involved two importations of live reptiles from Colombia in March 1993, in which some of the reptiles arrived dead as a result of improper ventilation and labeling. In the course of his investigation of the incident, LiBrandi spoke to a representative of the defendant, one Bruce Edelman, who told LiBrandi that he (Edelman) was aware of the IATA guidelines for shipping animals and thought that as an importer he was liable for the conditions under which wildlife enters the United States. The defendant was also assessed a penalty by the Fish and Wildlife Service in March 1994 when several dead animals were discovered in a shipment of small mammals and reptiles from Egypt. An investigation of the incident revealed that the company had failed to follow applicable IATA guidelines and that the packaging of the animals had been improper. And in March 1995, the Fish and Wildlife Service cited the defendant for a violation involving the importation of chameleons, skinks, geckos, other lizards, and frogs.

The defendant presented no witnesses at trial.

In an opinion and order dated December 17, 1996, the magistrate judge found the defendant guilty of violating 18 U.S.C. § 42(c). *See Bronx Reptiles*, 949 F.Supp. at 1014. First, she concluded that the government had established beyond a reasonable doubt both that the defendant had caused the transportation to the United States of the frogs and that the conditions under which the frogs were transported were inhumane and unhealthful. *See id.* at 1009. Second, she rejected the defendant's argument that because frogs are reptiles, they are not covered by the statute; the magistrate judge found that frogs, in fact, are amphibians, but that in any event both amphibians and reptiles fall within the ambit of the statutory proscription. *See id.* at 1010. Third, the magistrate judge determined that in order to be held liable under § 42(c), an importer need only have knowingly caused the transportation to the United States of the wild animal or bird, and need not have done so knowing that the conditions of transportation were inhumane or unhealthful. *See id.* at 1011–13. She noted in a footnote that the government had failed to prove that the defendant knew, or consciously avoided knowing, of the unhealthful or inhumane conditions under which the frogs were transported to the United States. *See id.* at 1012 n. 14. Because the magistrate judge concluded that the defendant "knowingly" caused the frogs to be transported to the United States, however, she convicted the defendant under the statute. *See id.* at 1013–14. She sentenced the defendant to pay a fine of $10,000, the maximum under the statute, and a $50 special assessment. She also sentenced the defendant to a five-year period of probation.

Pursuant to 18 U.S.C. § 3402, the defendant appealed the judgment of conviction to the district court. In a brief order, the district court affirmed. *See Bronx Reptiles*, 26 F.Supp.2d 481.

This appeal followed.

## DISCUSSION

■ "The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424, 105 S.Ct. 2084, 85 L.Ed.2d 434

(1985) (citing *United States v. Hudson,* 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812)). In determining the mental state of a defendant that the government must prove to convict under 18 U.S.C. § 42(c), the intent of Congress is our lodestar. *See United States v. Bailey,* 444 U.S. 394, 406, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980); *United States v. Figueroa,* 165 F.3d 111, 114 (2d Cir.1998). We are to "seek the proper ' "inference of" ' " this intent. *United States v. Hopkins,* 53 F.3d 533, 537 (2d Cir.1995) (quoting *Staples v. United States,* 511 U.S. 600, 604, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (quoting *United States v. Balint,* 258 U.S. 250, 253, 42 S.Ct. 301, 66 L.Ed. 604 (1922))).

## I. The Language of § 42(c) and *Mens Rea*

▮ Although the language of a statute does not always absolutely determine its meaning, *see Lewis v. Grinker,* 965 F.2d 1206, 1221–22 (2d Cir.1992), it is the primary means by which to determine congressional intent. *See Disabled in Action v. Hammons,* 202 F.3d 110, 119 (2d Cir. 2000). We therefore begin by examining the language of § 42(c), reviewing the district court's interpretation *de novo. See Figueroa,* 165 F.3d at 114.

18 U.S.C. § 42(c) provides:

[I]t shall be unlawful for any person, including any importer, knowingly to cause or permit any wild animal or bird to be transported to the United States, or any Territory or district thereof, under inhumane or unhealthful conditions....

▮ It seems reasonably clear from a reading of the text that the word "knowingly" in this sentence refers to all three of the phrases that follow: "[1] caus[ing] or permit[ting] any wild animal or bird to be transported [2] to the United States ... [3] under inhumane or unhealthful conditions."

First, § 42(c) is a provision of a criminal statute describing behavior that it declares to be "unlawful." The reader therefore expects the sentence to tell him or her what it is that a person must do "knowingly" to perform a criminally punishable act. Reading knowingly to apply (1) to the language "to cause or permit any wild animal or bird to be transported" and (2) to the phrase "to the United States," but not to (3) the requirement that such transportation be "under inhumane or unhealthful conditions," leads to a highly unlikely result: A vast range of remarkably innocuous behavior is rendered criminal. Not only the importer but the pet store owner or the casual purchaser of pets may well become guilty of a crime by purchasing a once-wild animal or bird—a skink or a frog, a tropical fish or a tropical bird—knowing only that the direct or indirect result of the purchase is that a "wild animal or bird [will] be transported to the United States." To avoid this extraordinary and unlikely result, the reader is bound to read the requirement of knowledge to apply to the provision that the animal or bird be transported "under inhumane or unhealthful conditions" so that the "unlawful" act prohibited involves wrongdoing.[2]

Second, there is nothing in the structure or punctuation of § 42(c) that signals the reader that "knowingly" does *not* apply to the phrase "under inhumane or unhealthful conditions." The statute could have been written, for example, to render it "unlawful for any person knowingly to cause or permit any wild animal or bird to be transported to the United States, *the conditions of which transportation* are in-

---

**2.** Compare the word "knowingly" in a hypothetical statute that provides: "It shall be unlawful for any person knowingly to open an envelope containing mail intended for another person." The statute clearly requires the letter opener to know not only that he or she is opening an envelope but also that the enclosed mail is intended for another person. Otherwise, the law would prohibit the innocent act of opening of an envelope that through no fault of the opener contained mail addressed to another.

humane or unhealthful," [3] or "knowingly to cause or permit any wild animal or bird to be transported to the United States (*insofar as the conditions of transporting* the animal are inhumane or unhealthful)." [4] In the former case, the comma and the word "which," and in the latter, the parentheses and the words "insofar as," indicate that "knowingly" might have been intended to apply only to causing or permitting a wild animal to be transported to the United States. But § 42(c) as written contains no punctuation or phrasing—no comma, no "which," no parentheses, no "insofar as"— to undermine the most obvious reading of § 42(c): that "knowingly" extends to the phrase "inhumane or unhealthful."

■ If a simple review of the language of § 42(c) does not establish that "knowingly" refers to "inhumane or unhealthful," however, the legal principle that criminal statutes are presumed to contain a *mens rea* requirement does. In interpreting criminal laws, we are required to assume that Congress "legislate[d] against the background of our traditional legal concepts which render intent a critical factor." *United States v. United States Gypsum Co.*, 438 U.S. 422, 437, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). As Justice Jackson, writing for the Supreme Court in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), observed:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal

individual to choose between good and evil.

*Id.* at 250, 72 S.Ct. 240. " '[T]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American jurisprudence.' " *Gypsum*, 438 U.S. at 436, 98 S.Ct. 2864 (quoting *Dennis v. United States*, 341 U.S. 494, 506, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)). "[S]ince *Morissette* it has become clear that knowledge may suffice for criminal culpability if 'extensive enough to attribute to the knower a "guilty mind," or knowledge that he or she is performing a wrongful act.' " *United States v. Sanders*, 211 F.3d 711, 723 (2d Cir.2000) (quoting *Figueroa*, 165 F.3d at 115–16); *cf.* MODEL PENAL CODE § 2.02(1) (Proposed Official Draft 1962) (stating as the default rule that "a person is not guilty of an offense unless he acted purposely, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense").

In applying the presumption that a *mens rea* is required, our recent decision in *Figueroa*, 165 F.3d 111, is highly instructive. There we interpreted a statute that set forth increased criminal penalties for "[a]ny person who knowingly aids or assists any alien excludable under Section 1182(a)(2) ... (insofar as an alien excludable under such section has been convicted of an aggravated felony) ... to enter the United States." *See id.* at 112. We observed that "knowingly" could not apply only to the phrase "aids or assists any alien to ... enter the United States" because there is nothing wrong with aiding or assisting someone to enter the United

---

**3.** *Cf. United States v. Tolkow*, 532 F.2d 853, 858 (2d Cir.1976) ("Whoever ... knowingly ... fails to disclose any fact the disclosure of which is required by [the Welfare and Pension Plans Disclosure Act] ... shall be fined not more than $10,000, or imprisoned not more than five years, or both" held not to require proof of knowledge of requirements of Welfare and Pension Plans Disclosure Act).

**4.** *Cf. Figueroa*, 165 F.3d at 112, 118 (statute providing increased criminal penalties for "[a]ny person who knowingly aids or assists

any alien excludable under Section 1182(a)(2) ... (insofar as an alien excludable under such section has been convicted of an aggravated felony) ... to enter the United States," applies if the defendant "knowingly aids or assists any ... excludable alien ... to enter the United States" irrespective of whether the defendant knows that the alien "is excludable under Section 1182(a)(2)" or "excludable [because of having] been convicted of an aggravated felony").

States. Knowingly to do so would not evidence knowledge of wrongdoing sufficient to support the finding of *mens rea* ordinarily necessary to impose criminal responsibility on a defendant.

This principle of construction can be used to set a presumed floor to the knowledge requirement in [the statute under consideration]. In many, if not most, circumstances, it is perfectly innocent to aid persons in entering the United States. It is also perfectly innocent to assist many aliens, such as lawful permanent residents. Because criminal statutes should be presumed to criminalize only conduct that is accompanied by a non-innocent state of mind, the knowledge requirement in [the statute] must extend beyond the fact that the person aided is an alien.

*Id.* at 116; *see also Liparota*, 471 U.S. at 426, 105 S.Ct. 2084 (construing a statute to include an element of *mens rea* "is particularly appropriate where ... to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct"); *Staples*, 511 U.S. at 614–15, 114 S.Ct. 1793 (rejecting interpretation of statute offered by government in part because such a construction "potentially would impose criminal sanctions on a class of persons whose mental state—ignorance of the characteristics of weapons in their possession—makes their actions entirely innocent").

To apply these principles, we return to the language of 18 U.S.C. § 42(c): "[I]t shall be unlawful for any person, including any importer, knowingly to cause or per-mit any wild animal or bird to be transported to the United States ... under inhumane or unhealthful conditions...." For much the same reasons that a simple review of the language of § 42(c) indicates that "knowingly" applies to "inhumane or unhealthful," the *mens rea* presumption compels the interpretation. "In many, if not most, circumstances, it is perfectly innocent," *Figueroa*, 165 F.3d at 116, for a person knowingly to cause or permit the transportation of a wild animal or bird to the United States. We can safely assume that not only animal importers, but circuses, pet stores, pet purchasers, and others regularly, knowingly, and innocently cause or permit wild animals, from elephants to parrots to parrot fish, to be transported to the United States. As we could find no *mens rea* in *Figueroa* for someone to aid persons in entering the United States, we can find none here for someone to "cause or permit [a] wild animal or bird to be transported to the United States." We therefore hold that to apply the "knowingly" requirement only to "caus[ing] or permit[ting] any wild animal or bird to be transported to the United States" would be to go below the "floor to the knowledge requirement" that we identified in *Figueroa*, 165 F.3d at 116.

■ There is, moreover, neither statutory language nor legislative history to overcome the *mens rea* presumption. We would expect that if Congress meant, contrary to the presumption, to impose liability absent a "guilty mind," it would have said so.[5]

5. We also note that whether conditions are "inhumane or unhealthful" is a question of fact. We are thus not confronted by an assertion that the statute requires that the defendant must know that what he is doing is unlawful in order to be guilty of a crime. *Cf., e.g., Bryan v. United States*, 524 U.S. 184, 192–93, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) ("knowingly" does not require knowledge of unlawfulness); *Liparota*, 471 U.S. at 425, 105 S.Ct. 2084 (knowledge of unlawfulness required); *Hopkins*, 53 F.3d at 541 (knowledge of unlawfulness not required). Reading the word "knowingly" to refer to a violation of law in such cases is in tension with the principle that "ignorance of the law is no excuse." *Cf. United States v. Freed*, 401 U.S. 601, 612, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (Brennan, J., concurring in judgment) ("If the ancient maxim that 'ignorance of the law is no excuse' has any residual validity, it indicates that the ordinary intent requirement—*mens rea*—of the criminal law does not require knowledge that an act is illegal, wrong, or blameworthy."). A defendant's ignorance of a fact in connection with an asserted criminal offense, to the contrary, may of course be "an excuse." *See, e.g., Staples*,

Looking to legislative history, the magistrate judge thought that an exchange between Senator Moore and Archibald McDonald, then-Chief Inspector of the Animal Rescue League of Boston, Massachusetts, at a hearing of the subcommittee of the Senate Committee on Interstate and Foreign Commerce on May 7, 1948, nonetheless indicated that the knowledge requirement does not apply to the conditions of transportation. The testimony at the hearing was incorporated by reference into the Senate and House Report on the 1948 Amendment to the Lacey Act. The relevant portion reads:

> Senator Moore.... This is a matter for legislation, making it a penal offense against whom? Who would this penalty be against where you have inhumane treatment of animals shipped from overseas to this country?
>
> Mr. McDonald. I do not believe we could hold somebody in Africa for it.
>
> . . . . .
>
> Senator Moore. Whom are you going to hold liable here?
>
> Mr. McDonald. The only way we could hold them I believe, is the man who purchases them here. If you hold him up, then you will get results.
>
> Senator Moore. That is the importer?
>
> Mr. McDonald. That is right.
>
> . . . . .
>
> Senator Moore.... The question is: whose duty is it to see [the animals] are humanely loaded and handled and shipped? Do you want to impose that on the vessel?
>
> . . . . .
>
> Senator Moore. Should that be made the duty of the importer?
>
> Mr. McDonald. The importer seems to be the only man that we could—
>
> Senator Moore. That is the only man that I think should have that responsibility.

511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (holding that knowledge that firearm pos-

*See Bronx Reptiles*, 949 F.Supp. at 1012 n. 13 (quoting Hearing Before a Subcommittee of the Committee on Interstate and Foreign Commerce, United States Senate, 80th Congress, 2d Session, on S. 1447 (May 7, 1948), at 7–10).

While this testimony may suggest that Congress viewed imposing liability on importers as the only way to affect the conditions under which wild animals and birds were transported to the United States, it does not speak to what requirements for importers' liability Congress intended to impose. That Congress wished to place liability on importers of wild animals and birds transported to the United States under "inhumane and unhealthful conditions" is consistent with both a requirement that the importer know of the inhumane and unhealthful conditions and the absence of such a requirement.

In the words of the *Liparota* Court:

> Of course, Congress *could* have intended that [a] broad range of conduct be made illegal, perhaps with the understanding that prosecutors would exercise their discretion to avoid ... harsh results. However, given the paucity of material suggesting that Congress did so intend, we are reluctant to adopt such a sweeping interpretation.

471 U.S. at 427, 105 S.Ct. 2084.

■ We disagree with the district court's view that under our interpretation of § 42(c) it will be "virtually impossible for the government to prove that an importer knowingly caused the shipment of an animal with knowledge that the overseas shipper was sending the animal under inhumane conditions." *Bronx Reptiles*, 949 F.Supp. at 1012. Circumstantial evidence is typically sufficient to permit an inference of criminal knowledge. *See, e.g., United States v. Kim,* 193 F.3d 567, 575 (2d Cir.1999) (finding sufficient evidence from which to infer knowledge of illegal

sessed characteristics making it a machine-gun was required for conviction).

alien status for purposes of 8 U.S.C. § 1324). And we have held that "conscious avoidance" is enough to satisfy the requirement of criminal knowledge " ' "when a defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance." ' " *United States v. Walker*, 191 F.3d 326, 337 (2d Cir.1999) (quoting *United States v. Gabriel*, 125 F.3d 89, 98 (2d Cir.1997) (quoting *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1195 (2d Cir.1989))); *see also Hopkins*, 53 F.3d at 542. We thus do not think that requiring the government to prove that a defendant "knew" that the conditions under which it caused or permitted wild animals or birds to be transported to the United States were inhumane or unhealthful would thwart the law's enforcement. Even if we did, however, that decision belongs to Congress, not to us.

■ In sum, to permit the defendant to be convicted of a crime under 18 U.S.C. § 42(c) without knowledge of the "inhumane or unhealthful" conditions under which the frogs were transported to the United States would be to impose upon them guilt absent a *mens rea*. This is contrary to the fundamental presumption that *mens rea*, a "guilty mind," is a prerequisite to conviction for a crime.

## II. "Public Welfare Offenses"

The government points out that in cases involving "public welfare offenses," courts have declined to read into statutes a *mens rea* requirement, concluding that Congress intended to impose a form of strict criminal liability instead. *See Staples*, 511 U.S. at 607, 114 S.Ct. 1793; *Figueroa*, 165 F.3d at 116–17. We disagree with the government's assertion that this is one of those cases.

"[P]ublic welfare offenses have been created by Congress, and recognized" by courts "in limited circumstances." *Staples*,

511 U.S. at 607, 114 S.Ct. 1793 (internal quotation marks omitted). Although the Supreme Court has explicitly declined to define this category of offenses precisely, *see id.* at 619–20, 114 S.Ct. 1793 (citing *Morissette*, 342 U.S. at 260, 72 S.Ct. 240), it has noted that cases recognizing such offenses "[t]ypically ... involve statutes that regulate potentially harmful or injurious items," *id.* at 607, 114 S.Ct. 1793; *see, e.g., Balint*, 258 U.S. at 254, 42 S.Ct. 301 (Narcotic Act of 1914); *United States v. Freed*, 401 U.S. 601, 609, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (National Firearms Act). "In such situations, [the Court has] reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him 'in responsible relation to a public danger,' he should be alerted to the probability of strict regulation, and [it may be] assumed that Congress intended to place the burden on the defendant to 'ascertain at his peril whether [his or her conduct] comes within the inhibition of the statute.' " *Staples*, 511 U.S. at 620, 114 S.Ct. 1793 (citations omitted); *cf. Figueroa*, 165 F.3d at 116–17 ("These Supreme Court cases stand for the proposition that absent congressional intent to the contrary, statutes defining public welfare offenses should be read to require only so much knowledge as is necessary to provide defendants with reasonable notification that their actions are subject to strict regulation.").

■ In support of its claim that a violation of § 42(c) is a "public welfare offense," the government relies on our recent decision in *Figueroa*. In that case, discussed in section I above, we held that the defendant's knowledge of the specific legal basis for an alien's exclusion is unnecessary for conviction of a person aiding an excludable alien to enter the United States—but only "because knowledge that an alien is excludable should put any reasonable person on notice that it would be illegal to aid that person's entry into the country." *Id.* at 118.[6] In the case at bar,

---

6. Judge Oakes, in his dissent, *post* at 92, refers to *Figueroa* as holding that the alien-

such notice of illegality is precisely what is missing. Frogs are not "potentially harmful or injurious items," *Staples,* 511 U.S. at 607, 114 S.Ct. 1793, and there is in our view nothing about transporting them that would "place[ ] [a defendant] in responsible relation to a public danger, . . . alert[ing it] to the probability of strict regulation." 511 U.S. at 607, 114 S.Ct. 1793 (internal quotation marks omitted). We thus decline to recognize a violation of § 42(c) as a "public welfare offense."

 The government also argues that a *mens rea* requirement need not be inferred where the penalties for violating a statute are relatively small. That is simply wrong. While "a severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a *mens rea* requirement," *Staples,* 511 U.S. at 618, 114 S.Ct. 1793, it does not follow that whenever a penalty is not "severe," we may dispense with the need to prove *mens rea* as to a critical element of a crime. This is especially so where, as here, dispensing with such a requirement would "criminalize a broad range of apparently innocent conduct." *Liparota,* 471 U.S. at 426, 105 S.Ct. 2084.

## CONCLUSION

Because the government failed to satisfy its burden under 18 U.S.C. § 42(c), we reverse the judgment of the district court and remand with instructions to enter a judgment of not guilty.

OAKES, Senior Circuit Judge:

I respectfully dissent.

Bronx Reptiles imports live animals, including reptiles, into the country approxi-

mately twice a week. Since at least 1993, it has been well aware of the IATA guidelines used by the industry to determine how a specific species is to be shipped and of the container requirements listed in the guidelines. Indeed, a special agent of the U.S. Fish and Wildlife Service, Division of Law Enforcement, who spoke with Bruce Edelman, the owner of Bronx Reptiles, testified that Mr. Edelman knew of the IATA guidelines and knew that as an importer he was liable for the conditions under which wildlife entered the United States.

Despite its knowledge of IATA guidelines, Bronx Reptiles has arranged for a number of shipments that involved inadequately packed and ventilated shipments. In 1993, Bronx Reptiles arranged for an importation of iguanas and boa constrictors from Colombia that resulted in a substantial number of dead reptiles due to improper ventilation and improper labeling. Based on the two shipments from Colombia, notices of violation were issued to Bronx Reptiles and civil fines were subsequently paid. A similar incident occurred in March of 1994, involving small mammals and reptiles from Egypt in which a number of dead animals were discovered and as well a number of weaning mothers with young were improperly packaged. In March of 1995, Bronx Reptiles was cited for yet another importation of chameleons, skinks, geckos and other lizards and frogs in inhumane fashion.

There was no doubt whatsoever that the shipment of frogs from the Solomon Islands, at the center of this case, was improper. The container was shallow and the frogs were not separated. Furthermore, *no damp materials or water trays*

smuggling statute considered there was a public welfare statute. We do not share his reading of the case. *Figueroa* seems to us to reason that although the statute there in issue was *not* a public welfare statute principles arising out of the public welfare statute line of cases are more broadly applicable to nonpublic welfare statutes such as the one in that case. *See Figueroa,* 165 F.3d at 117 ("The

Supreme Court has recently applied the interpretive principles employed in the case of public welfare crimes to a broader class of federal criminal statutes."). The strict criminal liability permissible under public welfare statutes is not allowed under ordinary criminal statutes such as the one considered here and in *Figueroa,* where *mens rea* is required.

were included to keep the frogs properly hydrated. This was highly improper since, as should be obvious to anyone, frogs have to have sufficient water to keep their skin from dehydrating. The former superintendent of reptiles and amphibians at the Bronx Zoo testified to the wide knowledge in the importation business of the IATA guidelines. These, of course, were violated by the shipment. He also testified to the customary practice of those in the importing business to check out the shipper, seek out references, and call the shipper to be certain that the shipper was aware of and understood the shipping requirements, including the IATA standards. Despite its vast experience in shipping and its prior violations, Bronx Reptiles did not fulfill its obligations under the guidelines.

No evidence was introduced by Bronx Reptiles to contradict any of the foregoing.

The majority holds that a violation of § 42(c) is not a public welfare offense and further holds that for a conviction under § 42(c) to stand, Bronx Reptiles had to know specifically that the frogs were improperly packed. In my view § 42(c), under the law of this Circuit, is properly treated as a public welfare statute. In *Figueroa*, we held that the alien-smuggling statute was properly treated as a public welfare statute "because knowledge that an alien is excludable should put any reasonable person on notice that it would be illegal to aid that person's entry into the country." *Figueroa*, 165 F.3d at 118. The majority here has determined that § 42(c) is not a public welfare law, reasoning that there is nothing about transporting frogs that would "place a defendant in responsible relation to a public danger, ... [thus] alerting it to the probability of strict regulation." *Supra* (quoting *Staples*, 511 U.S. at 607, 114 S.Ct. 1793). I disagree.

The provision against inhumane transportation, which is the subject of this prosecution, has been in the law since 1948. The legislative history makes it clear that Congress knew that it could not hold foreign shippers liable for the conditions in which animals were shipped, and that it was necessary to hold the United States importer responsible for ensuring, by contract or otherwise, that the transportation would be done in a humane fashion. *See* 1948 U.S.C.C.A.N. 2180–2182. Thus, Congress plainly contemplated that United States importers would be in a position where they could be responsible for ensuring safe transport of live animals.

The IATA guidelines themselves illustrate that the transport of live animals, including live reptiles and amphibians, is a delicate and risky business. As Congress clearly found, it is the United States importer who is in a position to take responsibility for ensuring the safe and humane transport for foreign animals. The fact that it is arranging for the transport of animals that are *alive* puts it on notice of the "probability of strict regulation." The United States importer can arrange by contract to ensure the safety of the animals. Thus, the United States importer is in responsible relation to the public danger of harm to the wildlife that it caused to be shipped to this country and should be strictly regulated.

After concluding that § 42(c) should be treated as a public welfare statute, I now properly turn to the question of what intent is required under *Figueroa*. We stated in *Figueroa*, 165 F.3d at 116, that "statutes defining public welfare offenses should be read to require only so much knowledge as is necessary to provide defendants with reasonable notification that their actions are subject to strict regulation." The *Figueroa* Court held that a defendant could be held guilty under that law so long as he or she had sufficient knowledge to recognize that he or she had done something culpable. *See id.* at 118. Applying that principle, the Court reasoned that the defendant must have known that the person he was smuggling in to the country was an excludable alien but the government did not need to prove that the defendant was aware of the specific ground for exclusion. *See id.* at 118–19.

Thus, under *Figueroa*, awareness by the defendant that it was doing something wrong is sufficient to sustain a conviction for a public welfare violation.

Here, the uncontradicted evidence at trial demonstrated beyond a reasonable doubt that Bronx Reptiles arranged for the shipment of live animals, knew of the IATA guidelines, had failed to meet these requirements numerous times in the past, and submitted no evidence to show that they had attempted to assure the safety of the shipment here involved despite their knowledge that under the guidelines they should do so. Thus, in my view, the evidence in this case is sufficient so that a jury could find that Bronx Reptiles knew there was a high probability that the frogs would be shipped under inhumane conditions and was aware that it was doing something wrong. To hold that this evidence is insufficient would eviscerate the Act's purpose because it would be nearly impossible to prove that the United States importer is liable for the conditions under which the animals are shipped, contrary to congressional intent.

The analogy to the hypothetical posed by the majority in footnote 2 of its opinion is inapposite. The majority hypothetical sets forth a statute making it unlawful for any person knowingly to open an envelope containing mail intended for another person and suggests that the person would have to know that the enclosed mail was intended for another person or else the mere opening of an envelope could be punishable. But this is true only if the envelope were not addressed to the person to whom the letter was sent. Here, in the business of importation, Bronx Reptiles well knew the requirements for shipping frogs and, being the large and frequent importer that it is, should have required that the shipper box the frogs according to the IATA rules and standards. Nothing in this record indicates that this was done. In fact, everything in the record indicates that it was not done and that Bronx Reptiles took no steps whatever to see that it was done. In other words, the letter it opened, to continue the analogy, had the name of another addressee on it.

I would affirm the conviction.