273 F.3d 139 (2nd Cir. 2001)
 UNITED STATES OF AMERICA, APPELLEE,
v.
MELVIN WEINTRAUB, JOHN DAWSON, MORELITE DEV & CONST, INC AND LIBERTY REALTY ASSOCIATES, LLC, DEFENDANTS-APPELLANTS,
SALVATORE NAPOLITANO, ROBERT WELSH, DOMINIC ONOFRIO, ECCO CONSTRUCTION, INC., MILL RIVER ENVIRONMENTAL CORPORATION AND ARTHUR HARRIS, DEFENDANTS.
 Docket Nos. 99-1691(L), 00-1368, 00-1385
August Term 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: March 1, 2001
Decided: November 19, 2001
 
 Defendant Melvin Weintraub appeals from a judgment of the United States District Court for the District of Connecticut (Janet Bond Arterton, District Judge) convicting him, after a jury trial, of criminal violations of and conspiracy to violate the Clean Air Act, 42 U.S.C. § 7413(c), and regulations promulgated thereunder, 40 C.F.R. §§ 61.145, 61.150.
 Affirmed.[Copyrighted Material Omitted]
 Barry A. Bohrer, Esq., Morvillo, Abramowitz, Grand, Iason & Silberberg (James C. Dugan, on the brief), New York, New York, for Appellant Weintraub.
 Jeffrey A. Meyer, Esq., Assistant United States Attorney (Stephen C. Robinson, United States Attorney for the District of Connecticut, on the brief), New Haven, Connecticut, for Appellee.
 Before: Walker, Chief Judge, Oakes and Pooler, Circuit Judges.
 
 John M. Walker, Jr., Chief Judge
 
 1
 Defendant Melvin Weintraub appeals from a judgment of the United States District Court for the District of Connecticut (Janet Bond Arterton, District Judge) convicting him, after a jury trial, of criminal violations of and conspiracy to violate the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7413(c)(1), (c)(2)(B), and regulations promulgated thereunder, 40 C.F.R. §§ 61.145, 61.150.
 
 BACKGROUND
 
 2
 In November 1995, Weintraub, a real estate developer and the primary shareholder of defendants-appellants Morelite Development & Construction, Inc. ("Morelite") and Liberty Realty Associates, LLC ("Liberty") (collectively the "Corporate Defendants"), began negotiations with the City of New Haven, Connecticut ("the City") for the purchase of an abandoned office building located at 152 Temple Street in New Haven, with an eye to renovating the building and converting it into residential apartments. Prior to Weintraub's involvement, the City had engaged a consulting firm to evaluate the building for renovation or demolition, and that firm in turn had hired Mystic Air Quality Associates, Inc., ("Mystic") to perform an environmental analysis of the building. In reviewing the dilapidated property, Mystic prepared a report describing the presence of a considerable amount of asbestos both in floor tiles throughout the building and in insulation in the building's basement. An appraiser hired by the City estimated the building's value to be $40,000, after accounting for the building's poor condition and the estimated high cost of asbestos removal. The City provided Weintraub with the appraisal and the consultant's report, which included the Mystic report. In 1996, Weintraub and the City agreed that Liberty would purchase the property from the City for $40,000.
 
 
 3
 Morelite hired defendant Salvatore Napolitano to oversee operations at 152 Temple and defendant-appellant John Dawson as a sub-contractor to demolish the building's interior. Dawson was not licensed by the state to perform asbestos abatement. Nevertheless, throughout the demolition, employees under Dawson's supervision scraped up asbestos-containing floor tiles and removed asbestos-containing insulation from the basement. They placed the material in plastic garbage bags, which were then taped closed. At least some of the bags were dumped illegally by another defendant, Arthur Harris, at unauthorized sites including a local park and Amtrak property.
 
 
 4
 Soon after demolition began, in February 1997, a state health inspector began investigating reports that asbestos was being thrown from the windows of the building. During his investigation, the inspector noticed that asbestos-containing floor tiles had been removed and issued a warning letter that directed the defendants to hire a licensed asbestos-abatement contractor. Napolitano responded by hiring Eagle Environmental, Inc. ("Eagle") to survey the quantity and quality of asbestos in the building. In March 1997, Eagle issued a report that confirmed the Mystic report's finding of significant amounts of asbestos and stated that abatement work should be performed by a licensed contractor. Napolitano tried to bribe Eagle to provide paperwork indicating that the asbestos had been successfully abated, but Eagle refused.
 
 
 5
 In April 1997, after receiving a copy of the Eagle report but no evidence of proper abatement, the City's building inspector sent a letter to Weintraub asking when the "unsafe conditions" of the building would be eliminated. Thereafter, the building inspector and Liberty's lender continuously pressured Weintraub to produce documentation of proper asbestos abatement. In June 1997, with Weintraub's knowledge, Napolitano procured forged documents showing that abatement had been completed and provided the documents to the lender and building inspector. Based on that representation, the lender released the capital that Weintraub had sought, enabling Liberty to close on its purchase of the building in July 1997.
 
 
 6
 Both before and throughout the demolition process, Weintraub knew of the asbestos at 152 Temple Street. He received the Mystic report, which included an itemized accounting of the asbestos present in the building. He signed a demolition permit indicating that asbestos abatement would be required. He held numerous conversations with City personnel and his own employees regarding the asbestos in the building. He closely monitored Morelite's expenditures for the disposal of removed asbestos. He was told on several occasions of the need to employ the services of a licensed asbestos abatement contractor. He made a variety of statements regarding the legality of the asbestos removal. He evidenced knowledge of wrongdoing by complaining to the building inspector that the inspector should not communicate with him in writing about the building's asbestos problem. He also tried to persuade City personnel to make false statements about the defendants' compliance with asbestos regulations. And finally, he participated in the unsuccessful effort to procure phony abatement certifications from Eagle.
 
 
 7
 On September 24, 1998, a grand jury returned an eight-count indictment against all of the defendants. This was supplanted on March 10, 1999 by a superseding indictment against Weintraub, Dawson, the corporate defendants, and several other individual defendants. Napolitano, who had agreed to cooperate with the government, was named but not charged in the superseding indictment. Count One of the superseding indictment charged that the named defendants conspired to violate the CAA, 42 U.S.C. § 7413(c), by unlawfully removing and disposing of asbestos. Counts Two through Eight charged substantive violations of the CAA, the national emission standard for hazardous air pollutants for asbestos and accompanying "work practice standards" promulgated by the United States Environmental Protection Agency ("EPA") under the CAA, see 42 U.S.C. § 7412(h); 40 C.F.R. § 61.145(b), and causing, aiding, or abetting such violations, under 18 U.S.C. § 2. The substantive counts alleged improper handling and removal of asbestos- containing material and failure to notify EPA and the Connecticut Department of Environmental Protection ("DEP"), as required by EPA regulations. Prior to trial, the government voluntarily dismissed Count Eight, which alleged a failure to notify the DEP.
 
 
 8
 A jury trial was held in September 1999. At the close of the prosecution's case, Weintraub moved pursuant to Fed. R. Crim. P. 29(a) for judgment of acquittal on Counts Three to Five. Liberty made the same motion with respect to Counts Two to Seven. The district court denied the motions without prejudice to renewal. The jury returned guilty verdicts on all counts against Weintraub and the Corporate Defendants. All of the defendants renewed their Rule 29 motions and moved for a new trial pursuant to Fed. R. Crim. P. 33. The district court dismissed Counts Four and Five against Weintraub, finding insufficient evidence that he knew that the asbestos had not been properly "wetted" during removal, and Count Two against Liberty, on the basis that the corporation had not been formed at the time that it was allegedly required to report to EPA. The court denied all new trial motions.
 
 
 9
 On May 11, 2000, the district court sentenced Weintraub to imprisonment for 12 months and one day, to be followed by three years supervised release, and a $250,000 fine. Dawson was sentenced to 13 months incarceration, to be followed by three years of supervised release and a $10,000 fine. Each Corporate Defendant received five years probation and a $300,000 fine and was ordered to pay, jointly and severally, restitution of $16,600, to cover medical monitoring for workers exposed to asbestos. Finally, the district court sentenced all of the defendants jointly and severally to restitution of $6,534.08, payable to the City of New Haven and Amtrak. Weintraub, Dawson, and the Corporate Defendants appealed. In summary orders filed simultaneously with this opinion, we dispose of the appeals of Weintraub's co- appellants.[1]
 
 DISCUSSION
 
 10
 Weintraub alleges a host of errors in the district court, most of which do not merit discussion. Weintraub's most serious claim is that the district court erred in instructing the jury on the level of scienter that is required to prove a criminal violation of the Clean Air Act and its accompanying regulations.[2] In particular, Weintraub argues that the district court improperly failed to instruct the jury that the government was obligated to prove Weintraub's knowledge of "the facts underlying the essential threshold elements of the [asbestos] work-practice standards - the friability of asbestos containing materials and the threshold amount requirements." Because Weintraub failed in the district court to preserve this claim of error for appeal, we review it for plain error. We find that the district court's scienter instruction was not erroneous, and that, even if it were, the error was not "plain." We accordingly affirm the judgment of the district court.
 
 I. Regulatory Framework
 
 11
 Before turning to the circumstances of the case at hand, we briefly describe the regulatory framework that underlies it. Section 7412 of Title 42 of the United States Code authorizes the regulation of "hazardous air pollutants," one of which is asbestos, see 42 U.S.C. § 7412(b)(1), and directs the EPA to adopt "national emissions standards for hazardous air pollutants" ("NESHAPs") specific to each hazardous air pollutant and industrial "source category" emitting such pollutants, see 42 U.S.C. § 7412(c), (d); 40 C.F.R. §§ 61 and 63. If the EPA determines that promulgation or enforcement of a NESHAP under § 7412(d) for a particular source category would not be feasible, however, the agency is empowered to adopt a work-practice standard. See 42 U.S.C. § 7412(h)(1). Because asbestos is not typically "emitted through a conveyance designed and constructed to emit or capture [it]," 42 U.S.C. § 7412(h)(2)(A), such as a pipe or smokestack, but rather escapes from more diffuse sources such as open construction or demolition sites, EPA adopted a work-practice standard for the handling of asbestos in building demolition and renovation. See 40 C.F.R. §§ 61.145, 61.150; 55 Fed. Reg. 48,406 (Nov. 20, 1990). The standard imposes agency- notification, handling, and disposal requirements for covered demolition and renovation operations involving asbestos.
 
 
 12
 The work-practice standard does not cover all asbestos-containing material ("ACM") or all demolition and renovation operations. The standard applies only to "[r]egulated asbestos-containing material (RACM)," defined as
 
 
 13
 (a) Friable asbestos material, (b) Category I nonfriable ACM that has become friable, (c) Category I nonfriable ACM that will be or has been subjected to sanding, grinding, cutting, or abrading, or (d) Category II nonfriable ACM that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations regulated by this subpart.
 
 
 14
 40 C.F.R. § 61.141. In turn, "friable asbestos material" is defined as any substance including more than one percent asbestos as determined by "Polarized Light Microscopy," see 40 C.F.R. Pt. 763, Subpt. E, app. E, and which "when dry, can be crumbled, pulverized, or reduced to powder by hand pressure." 40 C.F.R. § 61.141. Collectively, Category I and II nonfriable ACM are defined as ACM containing more than one percent asbestos as measured by polarized light microscopy in particular industrial materials such as floor tiles or other materials that cannot be reduced to dust by hand pressure. See 40 C.F.R. § 61.141.
 
 
 15
 The work-practice standard will apply to a demolition or renovation operation only if specified threshold quantities of RACM are present. The work practice standard applies to a renovation only if
 
 
 16
 the combined amount of RACM to be stripped, removed, dislodged, cut, drilled, or similarly disturbed is... [a]t least 80 linear meters (260 linear feet) on pipes or at least 15 square meters (160 square feet) on other facility components, or... [a]t least 1 cubic meter (35 cubic feet) off facility components where the length or area could not be measured previously.
 
 
 17
 40 C.F.R. § 61.145(a)(4)(i)-(ii).
 
 
 18
 The CAA creates strict civil liability for violations of § 7412 or regulations adopted thereunder, which include the asbestos work-practice standard. See 42 U.S.C. § 7413(b)(2). The CAA also holds criminally liable "[a]ny person who knowingly violates any requirement or prohibition of... section 7412 of this title..., including a requirement of any rule, order, waiver, or permit promulgated or approved under such section[]." 42 U.S.C. § 7413(c)(1) (emphasis added). The meaning of the phrase "knowingly violates" in this context is at the heart of this appeal.
 
 II. Plain Error
 
 19
 On appeal, Weintraub challenges the district court's jury instructions on the level of scienter required to be proved to establish that he "knowingly violated" the work-practice standard, though he did not preserve this claim below. "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Fed. R. Crim. P. 30. If an appellant, aggrieved by a district court's jury instruction, failed to make such a particularized objection in the district court, we review the instruction only for plain error. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731-32 (1993). We will reverse only if "there [has been] (1) error, (2) that is plain,... (3) that affect[s] substantial rights[, and] (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." United States v. Knoll, 116 F.3d 994, 999 (2d Cir. 1997) (citing, inter alia, United States v. Olano, 507 U.S. 725, 732-37 (1993)) (internal quotation marks omitted). In general, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson v. Kibbe, 431 U.S. 145, 154 (1977).
 
 
 20
 Although the defendants did propose a jury instruction on scienter, they did not present the argument that Weintraub now asserts on appeal: that the jury could convict only if it found knowledge of friability and the threshold quantity required by the asbestos regulations. While the defendants' proposed instruction that "[a] person acts `knowingly' when he acts with an awareness of a fact or circumstance rendering his conduct illegal," could arguably be read to encompass the theory they press on appeal, it was insufficiently particular to raise the question now presented and thus preserve it for appeal. By failing to draw the district court's attention to the problem that Weintraub now complains of, the defendants deprived the district court of the opportunity to correct its putative error.
 
 
 21
 Weintraub also argues that counsel properly objected during the charge conference. To the contrary, defense counsel not only did not seek the instruction that Weintraub now argues for, they affirmatively accepted the government's formulation. Counsel for the government stated that "[our] concern is that the government doesn't have to prove that the defendant knew that it was 10 percent asbestos containing material and all that other stuff," to which counsel for Liberty responded, "Agreed." The court then summarized that the scienter standard required that "the defendant knew generally that the material was asbestos containing material," to which the defendants' attorneys responded variously "[y]eah," "[y]es," and "[t]hat works." Weintraub's counsel then specifically clarified that "asbestos containing material" meant only that the material involved in fact contained asbestos, not that it met the work-practice standard's definitions: "[t]hat the material was asbestos containing material... means you had to know it was asbestos." These statements, far from reasonably suggesting an objection of the sort Weintraub now advances, indicate counsel's acceptance of the instruction eventually given by the district court. Cf. United States v. Civelli, 883 F.2d 191, 194 (2d Cir. 1989) ("Counsel's further comments during colloquy with the court only compounded his earlier failure [to object], for his comments were expressions of acquiescence, not exception."). We consequently review for plain error.
 
 A. Error
 
 22
 The first requirement of plain error review is that the district court in fact must have erred. See Olano, 507 U.S. at 732. Here, we believe that the district court's jury instruction adequately conveyed the degree of scienter required by the CAA, because it required - consistent with defense counsel's suggestion at the charge conference - that the jury find that Weintraub knew that material involved in the renovation contained asbestos.
 
 1. Scienter Required by the Clean Air Act
 
 23
 Weintraub argues that the phrase "knowingly violates" in § 7413(c)(1) requires specific knowledge of the facts that meet the threshold requirements of the work-practice standard: the friability of the asbestos and the minimum quantities that are required to trigger the standard. We conclude that such detailed knowledge need not be shown.
 
 
 24
 To determine what Congress meant when it used the phrase "knowingly violates," we begin with the text of the statute. See Disabled in Action v. Hammons, 202 F.3d 110, 119 (2d Cir. 2000). The phrase is commonly used in criminal provisions, but many courts have found it and similar formulations ambiguous. See, e.g., United States v. X-Citement Video, Inc., 513 U.S. 64 (1994); Liparota v. United States, 471 U.S. 419 (1985); United States v. Int'l Minerals & Chems. Corp., 402 U.S. 558 (1971); United States v. Bronx Reptiles, Inc., 217 F.3d 82 (2d Cir. 2000); United States v. Figueroa, 165 F.3d 111 (2d Cir. 1998); United States v. Ahmad, 101 F.3d 386 (5th Cir. 1996). See generally Wayne R. LaFave & Austin W. Scott, Criminal Law § 3.4(b), at 214 (2d ed. 1986). It may plausibly be read to require either knowledge that the conduct in question violated the law or knowledge of the facts and circumstances that amount to a violation, without specific knowledge of the law.
 
 
 25
 On its face, the phrase appears to suggest that the government must prove that the defendant knew that he was violating the law. This reading is precluded, however, by the Supreme Court's decision in United States v. Int'l Minerals & Chems. Corp., in which the Supreme Court held that the phrase "knowingly violates" did not require knowledge that the defendant's conduct was unlawful. The Court found no evidence of congressional intent to abrogate the bedrock common law principle that ignorance of the law is not a defense. See Int'l Minerals, 402 U.S. at 562-63. We have reached a similar conclusion with respect to the similarly worded criminal provisions of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(c)(2)(A) ("knowingly violates"), and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(d) ("in knowing violation"). See United States v. Hopkins, 53 F.3d 533, 537-38 (2d Cir. 1995) (construing the CWA); United States v. Laughlin, 10 F.3d 961, 965- 66 (2d Cir. 1993) (construing RCRA). The only other circuit court to have construed "knowingly violates" in the CAA, notably also in a case involving the asbestos work-practice standard, applied International Minerals to conclude that the Act does not demand knowledge that one's conduct is illegal. See United States v. Buckley, 934 F.2d 84, 88 (6th Cir. 1991).
 
 
 26
 Instead, we hold that the phrase "knowingly violates" requires knowledge of facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal. Courts have applied a canon of statutory interpretation to read criminal statutes that are silent or ambiguous as to the required standard of mens rea, to demand knowledge of enough facts to distinguish conduct that is likely culpable from conduct that is entirely innocent. See Carter v. United States, 530 U.S. 255, 269 (2000) ("The presumption in favor of scienter requires a court to read into a statute only that mens rea which is necessary to separate wrongful conduct from `otherwise innocent conduct.'") (quoting X-Citement Video, 513 U.S. at 72); Liparota, 471 U.S. at 426 (reading statute to avoid "criminaliz[ing] a broad range of apparently innocent conduct"); United States v. Sanders, 211 F.3d 711, 723 (2d Cir.) ("[I]t has become clear that knowledge may suffice for criminal culpability if `extensive enough to attribute to the knower a `guilty mind,' or knowledge that he or she is performing a wrongful act.'") (quoting Figueroa, 165 F.3d at 115-16), cert. denied, 531 U.S. 1015 (2000); cf. Hanousek v. United States, 528 U.S. 1102, 120 S. Ct. 860, 861 (2000) (Thomas and O'Connor, JJ., dissenting from denial of certiorari) (stating that "we should be hesitant to expose countless numbers of construction workers and contractors to heightened criminal liability for using ordinary devices to engage in normal industrial operations"). "[S]cienter requirements should be presumed to [require no more knowledge than necessary to put a defendant] on notice that he is committing a non-innocent act." Figueroa, 165 F.3d at 117; id. at 118 (requiring "sufficient knowledge to recognize that they have done something culpable").
 
 
 27
 We emphasize that knowledge of "wrongdoing" and knowledge of "illegality" are different things.[3] The former requires knowledge only of facts that in a reasonable person would create an expectation that his conduct was likely subject to strict regulation. Determining the extent of the mens rea required by a statute thus involves a "commonsense evaluation of the nature of the particular device or substance Congress has subjected to regulation and the expectations that individuals may legitimately have in dealing with the regulated items." Staples v. United States, 511 U.S. 600, 619 (1994). The touchstone is the defendant's "settled expectations" about the regulated conduct.[4] X-Citement Video, 513 U.S. at 71; United States v. LaPorta, 46 F.3d 152, 158 (2d Cir. 1994), rev'd on other grounds, Sicurella v. United States, 157 F.3d 177 (2d Cir. 1998).
 
 
 28
 Our understanding of the appropriate mens-rea standard is informed by two Supreme Court decisions applying the scienter requirement of one statute to two different sets of facts. Compare United States v. Freed, 401 U.S. 601 (1971), with Staples, 511 U.S. 600. The National Firearms Act proscribes, inter alia, "receiv[ing] or possess[ing] a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). In 1971, the Freed Court held that hand grenades, which are included in the definition of "firearms," were obviously dangerous, closely regulated weapons that justified an inference of notice of wrongdoing: "one would hardly be surprised to learn that possession of hand grenades is not an innocent act." Freed, 401 U.S. at 609. The Court concluded that the defendant could be convicted without proof that he knew the grenades were unregistered. Knowingly possessing the grenades was sufficient to distinguish the defendant's conduct from an "innocent act." See id.
 
 
 29
 Twenty-three years later, in Staples, the Court applied the same analysis to the possession of a machine gun, but reached a nearly opposite result based on the different expectations of regulation associated with guns. The Court found that the long history of substantially unregulated possession of guns in the United States meant that a possessor would not reasonably expect that possession to be closely regulated. The Court consequently decided that the government was obligated to prove that the defendant knew that his gun was, in fact, capable of being fired automatically and thus was a machine gun, unregistered possession of which violated the Act. Simple knowledge that it was a gun was inadequate to create an expectation that its possession could be criminal. See Staples, 511 U.S. at 610-12. Knowledge that the weapon was automatic was necessary to distinguish between regulated and traditionally unregulated weapons and hence between likely culpable and likely innocent conduct. Although, like grenades, guns are dangerous, because the latter have historically been unregulated or lightly regulated, a defendant who knew only that he possessed a gun would not reasonably expect regulation.
 
 
 30
 In the instant case, Weintraub challenges his conviction on four counts, both substantively and as objects of the charged conspiracy: Count Two, causing a "renovation" of a building containing RACM without notifying EPA, in violation of 42 U.S.C. § 7413(c)(2)(B) and 40 C.F.R. § 61.145(b); Count Three, causing "wrecking and dismantling that broke up the asbestos containing materials," in violation of 42 U.S.C. § 7413(c)(1) and 40 C.F.R. § 61.145(c)(1); Count Six, causing "asbestos containing materials to be placed in containers that were not leak-tight and did not possess the required warning labels," in violation of 42 U.S.C. § 7413(e)(1) and 40 C.F.R. § 61.150(a)(1); and Count Seven, "dispos[ing] and caus[ing] to be disposed asbestos containing materials at one [or] more sites that could not legally accept asbestos for disposal," in violation of 42 U.S.C. § 7413(c)(1) and 40 C.F.R. § 61.150(b).
 
 
 31
 But for the presence of asbestos, each count describes conduct that is basically innocuous and largely unregulated. As a general matter, one who renovates or demolishes a building does not have to notify EPA or comply with federal regulations when handling or disposing of supplies or waste materials. Under normal circumstances, one would not expect regulation of such innocent activities. It is the presence of asbestos that distinguishes such activity from that which a reasonable person would expect to be prohibited or heavily regulated. Asbestos is thus "the crucial element separating legal innocence from wrongful conduct." X-Citement Video, 513 U.S. at 73.
 
 
 32
 Weintraub contends that the category of "asbestos" is analogous to the category of "guns" at issue in Staples and that therefore the government must demonstrate knowledge that the asbestos was RACM, as it had to demonstrate knowledge that the weapon was automatic in Staples. We disagree. Unlike the generic category of "guns" in Staples, the category of "asbestos" is easily sufficient to trigger an expectation of regulation in a reasonable person and to distinguish in his or her mind innocent from wrongful conduct. In Staples, the Supreme Court emphasized the long-standing tradition of substantially unregulated possession of firearms in this country as countering the inference that a possessor of a firearm should reasonably anticipate regulation. One would need to know that the weapon could fire automatically before one would suspect his possession to be wrongful. See Staples, 511 U.S. at 619. Likewise, in X-Citement Video, which involved a prosecution for trafficking in child pornography, the Court found that, because the First Amendment protects possession and distribution of pornography generally, one would not anticipate criminal liability for the distribution of what one knew only to be pornography. Rather, the Court concluded, one would need to know additionally that the pornography involved depictions of children to expect that its distribution would invite prosecution. See X-Citement Video, 513 U.S. at 72-73.
 
 
 33
 In contrast, a reasonable person's settled expectations about asbestos are quite different. As a general matter, asbestos is strictly regulated at the local, state, and federal levels and no reasonable person - let alone a sophisticated real estate developer like Weintraub - could be unaware that asbestos in almost all of its applications is closely regulated.[5] Beginning in the middle of the twentieth century, asbestos's grave public health implications became evident, and over the succeeding decades public control of asbestos has become pervasive. At the federal level, handling of asbestos is covered by a variety of regulatory schemes of which the air-pollution control regulations involved in this case are only a part. See 15 U.S.C. § 2641 (Asbestos Hazard Emergency Response Act ("AHERA"), governing removal of asbestos from schools); 30 C.F.R. § 71.702 (Mine Safety and Health Administration standard regulating mineworkers' exposure to asbestos dust); 40 C.F.R. § 763.80 (EPA regulations implementing AHERA); 40 C.F.R. § 763.120 (EPA workplace safety rules regulating asbestos in state and local public buildings); 29 C.F.R. § 1910.1001 (Occupational Safety and Health Administration ("OSHA") rules regulating occupational exposure to asbestos in a variety of industries); 29 C.F.R. § 1926.1101 (same, for the construction industry). State regulation of asbestos is also pervasive, and this is so both in Connecticut, where the building at 152 Temple Street in New Haven is located, and in New York, Weintraub's home state and the state of incorporation of the Corporate Defendants. See, e.g., Conn. Gen. Stat. Ann. § 19a-332b (agency notification of asbestos abatement activities); Conn. Gen. Stat. Ann. § 20-435 (licensing of abatement contractors); Conn. Gen. Stat. Ann. § 21a-337 (labeling of products containing asbestos); Conn. Gen. Stat. Ann. § 22a-252 (disposal of asbestos); Conn. Agencies Regs. § 19a-332a-1 (standards for asbestos abatement); N.Y. Lab. Law § 241 (demolition involving asbestos); N.Y. Lab. Law § 902 (licensing of asbestos contractors); N.Y. Comp. Codes R. & Regs. tit. 6, § 221.2 (spraying of asbestos surface coatings prohibited); N.Y. Comp. Codes R. & Regs. tit. 6, § 360-2.17(p) (restrictions on landfill disposal of asbestos); N.Y. Comp. Codes R. & Regs. tit. 8, § 155.5 (testing for asbestos prior to school renovation); N.Y. Comp. Codes R. & Regs. tit. 10, § 22.5 (reporting of "asbestos-related lung disease"); N.Y. Comp. Codes R. & Regs. tit. 10, § 73.1 (accreditation of asbestos safety training providers); N.Y. Comp. Codes R. & Regs. tit. 12, § 56-2.1 (licensing of asbestos contractors); N.Y. Comp. Codes R. & Regs. tit. 12, § 56-12.1 (asbestos handling and removal requirements). The use and handling of asbestos is also regulated at the municipal level, as is true in New Haven. See New Haven, Conn., Code § 16-60 (prohibiting use of sprayed asbestos in residential buildings and requiring and regulating its removal); see also, e.g., N.Y.C. Admin. Code § 16-117.1 ("Transport, storage and disposal of waste containing asbestos"); N.Y.C. Admin. Code § 24-146.1 ("Asbestos work").
 
 
 34
 Apart from the landscape of public regulation of asbestos at the federal, state, and local levels, we note that it has been the subject of judicial regulation through a torrent of tort litigation over the last 25 years. High profile awards, settlements, and bankruptcies have resulted from the filing of thousands of lawsuits by sufferers of asbestos-related ailments. See generally Lester Brickman, The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?, 131 Cardozo L. Rev. 1819 (1992); Christopher F. Edley, Jr., & Paul C. Weiler, Asbestos: A Multi-Billion-Dollar Crisis, 30 Harv. J. on Legis. 383 (1993).
 
 
 35
 Many of the state and local regulations cited above apply to asbestos below the thresholds in the federal work-practice standard. For example, Connecticut regulates asbestos removal without regard to whether the asbestos is "friable" and does so for quantities as small as three linear or square feet of asbestos-containing material, a threshold considerably below that which defines RACM. See Conn. Agencies Regs. § 19a-332-5; Conn. Agencies Regs. § 19a-332-1(e). Similarly, the New Haven regulations do not establish threshold asbestos quantities for regulation. See New Haven, Conn., Code § 16-61(b) (defining "asbestos emergency" as involving any amount of sprayed-on asbestos on the interior walls of a dwelling). In sum, no reasonable person at this late date could claim to be unaware that asbestos is severely regulated and that its handling is fraught with legal risk. A reasonable person thus could not hold "settled expectations" that handling of asbestos is innocent, substantially unregulated conduct, whether or not in quantities sufficient to trigger the CAA thresholds.
 
 
 36
 The foregoing considerations lead us to conclude that, in a criminal prosecution under § 7413 for a violation of the asbestos work- practice standard, the government need only prove that the defendant knew that the substance involved in the alleged violations was asbestos; it need not establish the defendant's knowledge that the conduct proscribed by the statute involved the kind and quantity of asbestos sufficient to trigger the asbestos work-practice standard. The government need not prove, for instance, that the defendant knew that polarized light microscopy would show that materials in the building contained more than one percent asbestos or that the material when crushed by hand pressure would form dust.
 
 
 37
 Under this standard, one who, in good faith, did not know that the building he was demolishing contained asbestos could not be convicted of "knowingly violat[ing]" the work-practice standard, even if the demolition in fact involved more than the threshold quantities of RACM. Only knowledge that the renovation or demolition involves asbestos can result in criminal liability, because no one can reasonably claim surprise that asbestos is regulated and that some form of liability is possible for violating those regulations.
 
 
 38
 Our holding that the scienter component of a criminal violation of the asbestos work-practice standard is satisfied by knowledge of the presence of asbestos and not the particular type of asbestos to which the standard applies is limited to such violations. The application of the scienter requirement to criminal violations involving other hazardous air pollutants or violations of other provisions of the CAA must await future cases.
 
 2. The District Court's Instructions
 
 39
 In light of the foregoing analysis, the district court's jury instructions were sufficient and we find no error. Our review of an allegation that the district court's jury instructions were legally erroneous is de novo. See United States v. Han, 230 F.3d 560, 565 (2d Cir. 2000). We do not review portions of the instructions in isolation, but rather consider them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law. See United States v. Bala, 236 F.3d 87, 94-95 (2d Cir. 2000); United States v. Imran, 964 F.2d 1313, 1317 (2d Cir. 1992).
 
 
 40
 The district court's instructions were plainly sufficient to inform the jury that it must find that Weintraub knew that the charged conduct involved asbestos. The district court stated that "[t]he government must prove... that the defendant knew that the material at 152 Temple Street contained asbestos," and later referred to the government's obligation to "prov[e] that the defendant knew the material at 152 Temple Street was asbestos."
 
 
 41
 Beyond those prefatory remarks, which applied to all of the challenged counts, the district court elaborated on the required showing of scienter for Counts Three, Six, and Seven. On Count Three the district court charged that the jury had to find that Weintraub "knew of wrecking and dismantling that broke up regulated asbestos-containing materials [that] occurred before removing asbestos-containing materials from the facility." Although this instruction is somewhat ambiguous regarding the required referents of Weintraub's knowledge, we are satisfied that the jury was informed that the government had to show Weintraub's knowledge of particular wrecking and dismantling that broke up asbestos. On Count Six, the court instructed the jury that it could convict if the defendants "knowingly caused regulated asbestos- containing material to be placed in containers that were not leak- tight." The court then reiterated that Weintraub must be shown to have "kn[own] that asbestos-containing materials were placed in non-leak tight containers." On Count Seven, the court permitted a conviction only on proof that Weintraub "knowingly disposed and caused to be disposed regulated asbestos-containing materials at one or more sites that could not legally accept asbestos for disposal," and stated that "the government must prove beyond a reasonable doubt... [that] the defendant knew that regulated asbestos-containing materials were disposed of at one or more sites that could not legally accept asbestos for disposal."
 
 
 42
 Of the four substantive counts challenged by Weintraub on appeal, only the instruction on Count Two failed to mention specifically that the government was required to prove that Weintraub knew that the material involved was asbestos. The district court charged on Count Two that "the government must prove beyond a reasonable doubt [that in] taking actions... the defendant knew renovation of 152 Temple Street began without providing notice to the administrator of EPA." Although this instruction, viewed in isolation, failed to mention the required knowledge of the involvement of asbestos, we are satisfied that the instructions as a whole conveyed the required level of scienter. In particular, the earlier general explanation of the required scienter conveyed to the jury that they could convict Weintraub on the challenged counts only if they found that he knew that asbestos was being removed at 152 Temple Street.
 
 B. Plain Error
 
 43
 Finally, we observe that even if we had held that the government was required to prove the detailed knowledge of regulated asbestos, the district court's failure to give such an instruction would not have been plain error. For an error to be plain, it must, "at a minimum," be "clear under current law." United States v. Feliciano, 223 F.3d 102, 115 (2d Cir. 2000) (citing Olano, 507 U.S. at 731-37), cert. denied, 121 S. Ct. 1405 (2001). A reviewing court typically will not find such error where the operative legal question is unsettled. See, e.g., United States v. Santiago, 238 F.3d 213, 215 (2d Cir.), cert. denied, 121 S. Ct. 2016 (2001); Fogarty v. Near N. Ins. Brokerage, Inc., 162 F.3d 74, 81 (2d Cir. 1998). Whether an error is "plain" is determined by reference to the law as of the time of appeal. See Johnson v. United States, 520 U.S. 461, 468 (1997). No binding precedent, whether at the time of trial or appeal, supports the position that Weintraub now advances. Without a prior decision from this court or the Supreme Court mandating the jury instruction that Weintraub, for the first time on appeal, says should have been given, we could not find any such error to be plain, if error it was.
 
 CONCLUSION
 
 44
 We have considered the remainder of Weintraub's contentions and find them to be without merit. For the foregoing reasons, the judgment of the district court is hereby affirmed.
 
 
 
 NOTES:
 
 
 [1]
 Defendant-appellant Dawson's court-appointed counsel has moved, pursuant to Anders v. California, 386 U.S. 738 (1967), to be relieved of his obligation to represent Dawson. By separate order today we grant the motion in tandem with the government's motion for summary dismissal of Dawson's appeal.
 
 
 [2]
 This claim is directed principally to the substantive offenses (Counts Two, Three, Six, and Seven), but Weintraub also attacks the conspiracy conviction (Count One) based on the allegedly flawed proof of the substantive offenses alleged as objects of the conspiracy.
 
 
 [3]
 Although mens rea is sometimes referred to as "guilty mind," see, e.g., Bronx Reptiles, 217 F.3d at 90, it does not demand knowledge of guilt in the sense of knowledge of the law that makes conduct illegal, but rather only knowledge of the facts that make conduct illegal, see id. at 88 & n.5. Accordingly, it is a proxy for knowledge of guilt rather than actual knowledge thereof.
 
 
 [4]
 The government contends that Weintraub was convicted of a so-called "public welfare offense" that demands a less onerous showing of mens rea. See Figueroa, 165 F.3d at 116-17 (collecting cases). We find it unnecessary to decide whether a criminal violation of the asbestos work- practice standard is such an offense.
 
 
 [5]
 Although the Supreme Court rejected a somewhat similar argument made by the government in Staples, it did so because the regulations to which firearm possession is subjected are not "sufficiently intrusive that they impinge upon the common experience that owning a gun is usually licit and blameless conduct." Staples, 511 U.S. at 613. As we discuss here, regulation of asbestos is quite different.